# Transportation of Federal Prisoners to State Courts Pursuant to Writs of Habeas Corpus

The Attorney General needs no specific statutory authorization in order to surrender custody of a federal prisoner to state authorities for transportation to a state court pursuant to a writ of habeas corpus, and no federal statute prohibits it.

Surrendering a federal prisoner to the temporary physical custody and control of state officers does not result in a loss of federal jurisdiction over the prisoner.

Escape of a federal prisoner temporarily in the custody of state authorities pursuant to the direction of the Attorney General would violate the federal escape statute, 18 U.S.C. § 751.

July 25, 1980

## MEMORANDUM OPINION FOR
## THE DIRECTOR, BUREAU OF PRISONS

This responds to your request for our opinion whether federal prisoners may be released to the physical custody of state law enforcement officers for transportation to a state court pursuant to the issuance of a writ of habeas corpus *ad testificandum* or *ad prosequendum*.[1] You also have requested our opinion whether escape by a prisoner thus released could be prosecuted as escape from federal custody under 18 U.S.C. § 751 (Supp. I 1977).

The United States Marshals Service (USMS) concludes that the Bureau of Prisons (BOP) may relinquish custody temporarily to state officials on state court writs without waiving federal jurisdiction or violating federal law. The USMS further concludes that a federal prisoner who escapes from such temporary state custody has violated 18 U.S.C. § 751. In your view, a federal prisoner may not be released from the physical custody of federal agents without specific statutory authorization, because federal custody must remain unbroken. You also suggest that if a federal prisoner who is released to state officials escapes, he could not be prosecuted under the federal escape statute.

For reasons stated more fully below, we conclude that federal jurisdiction over a prisoner committed to the custody of the Attorney General is not waived or otherwise lost if physical custody is surren-

---

[1] Your question, and accordingly, this response, are limited to situations to which the Interstate Agreement on Detainers, 18 U.S.C. Appendix, does not apply either because the requesting state is not a party to the Agreement or because the request for production is pursuant to a writ of habeas corpus *ad testificandum*, and thus not within the scope of the Agreement.

dered temporarily to state officials for the purpose of producing the prisoner in a state court pursuant to the issuance of a writ of habeas corpus *ad testificandum* or *ad prosequendum.* We conclude that specific statutory authorization is not required for such a temporary transfer of custody, and we have found no statute which expressly or impliedly prohibits it. We further conclude that escape by a federal prisoner while in the temporary custody of state officials would violate the federal escape statute.

## I.

In 1922, the Supreme Court settled the question whether a federal prisoner could be taken on a writ of habeas corpus to a state court and there prosecuted on state charges. *Ponzi* v. *Fessenden,* 258 U.S. 254 (1922). Ponzi argued, *inter alia,* that the state court could not try him without jurisdiction over his person and that, as a prisoner of the United States, he was "within the dominion and exclusive jurisdiction" of the United States. *Id.* at 258. The Court rejected this argument, describing it as "a refinement which if entertained would merely obstruct justice," and stated:

> The trial court is given all the jurisdiction needed to try and hear him by the consent of the United States, which only insists on his being kept safely from escape or from danger under the eye and control of its officer. This arrangement of comity between the two governments works in no way to the prejudice of the prisoner or of either sovereignty.

*Id.* at 265–66. The Court emphasized that our scheme of government, with the federal government and the governments of the several states each having their own system of courts, requires "not only definite rules fixing the powers of the courts in cases of jurisdiction over the same persons and things . . . but also a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure." *Id.* at 259. Physical custody of the federal prisoner was not an issue in *Ponzi,* however. A federal agent at all times had custody, and the Court, while not expressly relying on this fact as essential to the holding, did note it.

Following the lead of *Ponzi,* federal courts consistently have ruled that the federal government does not lose jurisdiction over a federal prisoner if it, as a matter of comity, arranges to produce a prisoner for prosecution in state court or for service of a state sentence. *See, e.g., Chunn* v. *Clark,* 451 F.2d 1005, 1006 (5th Cir. 1971); *Truesdell* v. *United States,* 400 F.2d 859, 860 (8th Cir. 1968); *Murray* v. *United States,* 334 F.2d 616, 617 (9th Cir. 1964); *Lovell* v. *Arnold,* 391 F. Supp. 1047, 1048 (M.D. Pa. 1975); *United States ex rel. Williams* v. *Fitzpatrick,* 299 F. Supp. 260, 261 (S.D.N.Y. 1969).

As noted in both your opinion request and the USMS memorandum, the past practice consistently has been to transport federal prisoners to state courts in the custody of a federal marshal and to require the states to reimburse the USMS for this expense. Accordingly, the question presented here, which is one of physical custody, has not been addressed directly by the courts. The cases, such as those cited above, which have considered related questions, however, have inferred that temporary transfers of physical custody also are matters of comity to be worked out between federal and state authorities.

In *Allen* v. *Hunter,* 65 F. Supp. 365 (D. Kan. 1946), for example, the court rejected the petitioner's claim that the federal government lost all jurisdiction over him when, after convicting and sentencing him, it permitted him to be returned to the Indiana State Prison. Quoting from the Tenth Circuit in *Wall* v. *Hudspeth,* 108 F.2d 865, 866 (10th Cir. 1940), the court held:

> When the court of one sovereign takes a person into its custody on a criminal charge he remains in the jurisdiction of that sovereign until it has been exhausted, to the exclusion of the courts of the other sovereign. That rule rests upon principles of comity, and it exists between federal and state courts. [Cites omitted.] But either the federal or a state government may voluntarily surrender its prisoner to the other without the consent of the prisoner, and in such circumstances the question of jurisdiction *and custody* is purely one of comity between the two sovereigns, not a personal right of the prisoner which he can assert in a proceeding of this kind.

*Allen* v. *Hunter,* 65 F. Supp. at 367–68 (emphasis added). *See also Young* v. *Harris,* 229 F. Supp. 922, 924 (W.D. Mo. 1964). The Fifth Circuit in *Chunn* v. *Clark, supra,* believed it "well-established" that a prisoner has no standing to contest an agreement between two sovereigns, and thus ruled that federal authorities did not lose jurisdiction over Chunn by complying with an Alabama writ. 451 F.2d at 1006.[2] Similarly, in *Potter* v. *Ciccone,* 316 F. Supp. 703, 705 (W.D. Mo. 1970), the court stated the "well-established" rule that the federal government does not lose jurisdiction of a prisoner because it permits a state "to take the prisoner *into its custody* . . ." (Emphasis added.) The court continued: "Thus, while the temporary custody of the other sovereign may postpone the rights

---

[2] Many of these cases have arisen on writs of habeas corpus filed by prisoners seeking either a release from custody or freedom from prosecution. The courts have held that such prisoners have no standing to contest an agreement between two sovereigns concerning the temporary exchange of custody of the prisoners on writs of habeas corpus *ad prosequendum* or their agreement as to the order of prosecution or execution of sentence. *See, e.g., Chunn* v. *Clark,* 451 F.2d 1005 (5th Cir. 1971); *Derengowski* v. *U.S. Marshal,* 377 F.2d 223 (8th Cir. 1967); *Lovell* v. *Arnold,* 391 F. Supp. 1047 (M.D. Pa. 1975).

of the first sovereign, it cannot defeat them and jurisdiction is not lost." *Id.* at 705–06.[3]

These issues also have arisen when state authorities have released state prisoners to the custody of federal authorities. Although in many of these cases, actual physical custody was transferred to federal authorities, the courts refused to find a loss of state jurisdiction. In *Bullock* v. *Mississippi,* 404 F.2d 75 (5th Cir. 1968), the prisoner-appellant sought release from a state detainer on the ground that by earlier transferring him to federal custody, the state had waived its right to jurisdiction over him. The court ruled that "[t]he State, by giving temporary custody to the federal authorities does so without a complete surrender of its prior jurisdiction over him." *Id.* at 76. *See also Derengowski* v. *U.S. Marshal,* 377 F.2d 223 (8th Cir. 1967).

These same rules apply when a prisoner is produced pursuant to a writ of habeas corpus *ad testificandum.* In *In re Liberatore,* 574 F.2d 78, 89 (2d Cir. 1978), the court held that: "any 'loan' to the second sovereignty in compliance with such a writ or any other temporary transfer of custody from the sovereignty having the prior jurisdiction cannot affect in any way whatever any final judgment of conviction already entered against the prisoner there or affect the running of the sentence imposed pursuant to that judgment." And, recently, the Ninth Circuit implemented this rule by declaring that a district judge's attempt to transfer a prisoner (who was serving concurrent federal and state sentences in state prison) from state to federal custody violated fundamental principles of comity and separation of powers. *United States* v. *Warren,* 610 F.2d 680 (9th Cir. 1980). The court wrote:

> Determination of *priority of custody* and service of sentence between state and federal sovereigns *is a matter of comity* to be resolved by the executive branches of the two sovereigns . . . [T]he sovereign with priority of jurisdiction, here, the United States, may elect under the doctrine of comity to relinquish it to another sovereign. This discretionary election is an executive, and not a judicial function. [Cites omitted.]
>
> In the federal system, the "power and discretion" to practice comity is vested in the Attorney General.

*Id.* at 684–85 (emphasis added).

The cases cited above establish that surrendering a prisoner to another jurisdiction for purposes of prosecution, testimony, or service of sentence does not affect a loss of jurisdiction by the surrendering

---

[3] Loss of jurisdiction also has been asserted where a state took into custody a federal defendant who was released from federal custody pending appeal. In *Jones* v. *Taylor,* 327 F.2d 493, 493–94 (10th Cir. 1964), the court rejected this contention because "[w]hen a person is convicted of independent crimes in state and federal courts, the question of jurisdiction *and custody* is one of comity between the two governments and not a personal right of the prisoner" (emphasis added).

authority. Although most of these cases did not address directly the question you raise other than *in dicta,* we believe that the policies underlying these cases yield the same result here. In our opinion, therefore, Federal jurisdiction is not lost if physical custody and control of Federal prisoners is transferred temporarily to State officers.[4]

## II.

In addition to raising jurisdictional questions, you have suggested that custody of a federal prisoner may not be surrendered to state authorities absent congressional authorization. Again relying on *Ponzi* v. *Fessenden, supra,* we believe that, as a general rule, specific statutory authorization is not required. In *Ponzi,* the Court wrote: "There is no express authority authorizing the transfer of a federal prisoner to a state court for [trial]. Yet we have no doubt that it exists and is to be exercised with the consent of the Attorney General." 258 U.S. at 261–62. The Court recited the many duties of the Attorney General with respect to prisons and prisoners, and concluded:

> This recital of the duties of the Attorney General leaves no doubt that one of the interests of the United States which he has authority and discretion to attend to, through one of his subordinates, in a state court, under § 367, Rev. Stats., is that which relates to the safety and custody of United States prisoners in confinement under sentence of federal courts. *In such matters he represents the United States and may on its part practice the comity which the harmonious and effective operation of both systems of courts requires, provided it does not prevent enforcement of the sentence of the federal courts or endanger the prisoner. Logan* v. *United States,* 144 U.S. 263.

*Id.* at 263 (emphasis added).[5]

Although we believe that specific statutory authorization is not required, it is necessary to review relevant statutes to determine whether

---

[4] In one sense, federal jurisdiction may be lost if physical custody is relinquished to state authorities. If a state violates doctrines of comity and refuses to return the prisoner to federal authorities, the federal government has no immediate jurisdiction over the prisoner without actual physical custody of the body. Its jurisdiction over the prisoner is limited to its power to enforce the federal sentence once the prisoner is released from state custody.

Unless an enforceable agreement is struck between federal and state authorities, the federal government would be without an adequate immediate remedy if the state refuses to return the prisoner. In that event, absent a violation of the Constitution, law, or treaties of the United States (28 U.S.C. § 2254), the federal government would have to await the release of the prisoner by the state. *See Strand* v. *Schmittroth,* 251 F.2d 590, 604–06 (9th Cir. 1957). The Associate Deputy Attorney General has indicated that this is not a serious practical problem because, if it happened once, no additional prisoners would be released to that state.

[5] *See also United States* v. *Warren,* 610 F.2d 680, 684–85 (9th Cir. 1980). The legislation creating the Department of Justice authorized the Attorney General to send the Solicitor General or any officer of the Department of Justice "to any State or district in the United States to attend to the interests of the United States in any suit pending . . . or to attend to any other interest of the United States." Act of June 22, 1870, § 5, 16 Stat. 162, 163. The current version of this section is 28 U.S.C. § 517.

Congress has prohibited, either expressly or impliedly, exercise of comity in this area by the Attorney General. We find no express statutory prohibition on temporary transfers of custody for the purpose of transporting federal prisoners to state court. The only statute we find which might be read to prohibit impliedly such a transfer is 18 U.S.C. § 4008.[6]

Section 4008 provides: "Prisoners *shall* be transported by agents designated by the Attorney General or his authorized representative" (emphasis added). The question raised by this section is whether it requires that in all cases a federal prisoner must be transported by a federal agent. We believe it should not be interpreted so restrictively. In our opinion, this statute was not intended to cover transportation solely for a state's convenience and upon a state's request.

Section 4008 was designed primarily to authorize payment of transportation expenses.[7] After stating that prisoners shall be transported by designated agents, the section provides: "The reasonable expense of transportation, necessary subsistence, and hire and transportation of guards and agents shall be paid by the Attorney General from such appropriation for the Department of Justice as he shall direct."[8] Similar language first appeared in an 1864 Act, which provided:

> Be it enacted . . . [t]hat all persons who have been, or who may hereafter be, convicted of crime by any court of the United States—not military—the punishment whereof shall be imprisonment, in a district or territory where, at the time of such conviction, there may be no penitentiary or other prison suitable for the confinement of convicts of

---

[6] At first glance, 18 U.S.C. § 4085(a) seems to relate to this question. This section provides: Whenever any federal prisoner has been indicted, informed against, or convicted of a felony in a court of record of any State or the District of Columbia, the Attorney General shall, if he finds it in the public interest to do so, upon the request of the Governor or the executive authority thereof, and upon the presentation of a certified copy of such indictment, information or judgment of conviction, cause such person, prior to his release, to be transferred to a penal or correctional institution within such State or District.

* * * * *

The expense of personnel and transportation incurred shall be chargeable to the appropriation for the "Support of United States prisoners."

This section, however, does not address the issue of temporary transfer of custody. It is distinguishable from the situations under review because it contemplates transfer immediately prior to expiration of the federal sentence so that upon release the prisoner is subject to the state authority. *See* S. Rep. No. 1410, 76th Cong., 3d Sess. 1 (1940); H.R. Rep. No. 1885, 76th Cong., 1st Sess. 1–2 (1940).

[7] If a section heading is enacted as part of an act or as part of a code, one may look to the heading as an aid to the legislative intent. *Knowlton* v. *Moore*, 178 U.S. 41.77 (1849); *Clawans* v. *Sheetz*, 92 F.2d 517, 521 (D.C. Cir. 1937); Sutherland, Statutes and Statutory Construction § 47.14 (1973 & Supp. 1978). Section 4008 is headed "Transportation expenses," suggesting that the primary purpose of the statute was to authorize payment for such expenses.

[8] The remainder of the section provides:
Upon conviction by a consular court or court martial the prisoner shall be transported from the court to the place of confinement by agents of the Department of State, the Army, Navy, or Air Force, as the case may be, the expense to be paid out of the Treasury of the United States in the manner provided by law.

> the United States, and available therefor, shall be confined
> . . . in some suitable prison in a convenient state or terri-
> tory to be designated by the Secretary of Interior, *and
> shall be transported and delivered to the warden or keeper of
> the prison by the marshal . . . the reasonable actual expense
> of transportation, necessary subsistence and hire, and trans-
> portation of guards and the marshal . . . to be paid by the
> Secretary of the Interior, out of the judiciary fund. . . .*

Act of May 12, 1864, § 1, 13 Stat. 74, 74–75 (emphasis added).[9] This section further provided that if, in the opinion of the Secretary, the expense of transportation would exceed the cost of maintaining a prisoner in a jail in the state of his conviction, then it would be lawful so to confine him. This measure passed the Congress with no recorded floor debate on its provisions. 64 Cong. Globe, 38th Cong., 1st Sess. 1684 (1864); 65 Cong. Globe 38th Cong., 1st Sess. 2207 (1864). The text of the Act suggests that its purpose was to resolve the question where federal prisoners should be incarcerated if there was no suitable penitentiary in the state or territory of conviction. The transportation provision, authorizing transportation and delivery to a suitable prison, was part of the resolution of this question.[10]

In 1876, responsibility for designating places of confinement was transferred to the Attorney General. Act of July 12, 1876, 19 Stat. 88–89. This Act also amended the Act of May 12, 1864, *supra,* by allowing the Attorney General to change the place of imprisonment as necessary. The transportation provisions in the Act were not substantively altered, however. They provided that prisoners "shall be transported and delivered to the warden . . . by the marshal . . . the reasonable actual expense of transportation, necessary subsistence, and hire and transportation of guards and the marshal . . . to be paid by the Attorney General, out of the judiciary fund." *Id.* An 1891 statute authorizing the establishment of three United States prisons also contained a section providing that transportation of all United States prisoners and their delivery to United States prisons shall be by the marshal and allowed the same expenses as did the previous statutes.[11] The language was

---

[9] Prior to that time, statutes allowed costs to United States Marshals for "transporting criminals." *See* Act of Feb. 26, 1853, 10 Stat. 165.

[10] A similar statute, providing for the confinement of juvenile offenders, and their transportation to the place of confinement by the marshal, was passed in 1865. Act of March 3, 1865, § 1, 13 Stat. 538. This Act provided:

> Be it enacted . . . [t]hat juvenile offenders . . . shall be confined . . . in some house of refuge to be designated by the Secretary of the Interior, and shall be transported and delivered to the warden or keeper of such house of refuge by the marshal . . . and the reasonable actual expense of the transportation, necessary subsistence, and hire, and transportation of assistants and the marshal or warden, only shall be paid by the Secretary of the Interior, out of the judiciary fund.

[11] Act of March 3, 1891, § 5, 26 Stat. 839, 839–40. Section 5 provided:

> That the transportation of all United States prisoners convicted of crimes against the laws of the United States in any State, District or Territory, and sentenced to terms of
> Continued

725

again amended in 1901, but, again, the substance of the transportation provisions was not changed. Act of March 3, 1901, 31 Stat. 1450-51. The legislative history of these acts is brief and the transportation provisions are not specifically addressed. 4 Cong. Rec. 2339, 4268 (1876); 22 Cong. Rec. 2925, 3563-64 (1891).

In 1930, Congress created the Bureau of Prisons and revised the laws relating to federal prisoners. The law regarding transportation of prisoners was amended to read substantially as it does today. As enacted at that time, it provided:

> All transportation of prisoners shall be by such agent or agents of the Department of Justice as the Attorney General or his authorized representative shall from time to time nominate, the reasonable expense of transportation, necessary subsistence, and hire and transportation of guards and agent or agents to be paid by the Attorney General from any appropriation to the Department of Justice as he may direct. . . .

Act of May 14, 1930, Pub. L. No. 71-218, § 8, 46 Stat. 325, 328. The major change was that "all transportation" shall be by "an agent or agents of the Department of Justice," rather than that transportation and delivery of prisoners to the place of confinement shall be by the marshal. The legislative history of this 1930 modification does not explain why these changes were made. The committee reports do indicate that the act resulted from concern about the lack of proper care and supervision of the increasing number of federal prisoners. H.R. Rep. No. 106, 71st Cong., 2d Sess. 1 (1930). The few federal penitentiaries were congested and "great masses" of federal prisoners were held in local jails and workhouses, some of which were considered "unsanitary and generally deplorable." S. Rep. No. 533, 71st Cong., 2d Sess. 1, 2 (1930). Accordingly, these reports and the floor debates concentrate on a program to provide adequate prison facilities and a proper organization to administer the federal penal system. 72 Cong. Rec. 2157-58 (1930). The only reference to the bill's transportation section in either report is a reference found in an attached Attorney General's analysis of the bill. That analysis stated: "Section 8 of the proposed bill clarifies how prisoners may be transported and the fund which is chargeable." H.R. Rep. No. 106, *supra*, at 3; S. Rep. No. 533, *supra*, at 3. There is no indication, however, that Congress intended that section to extend beyond its prior coverage of transportation and delivery to a place of

---

imprisonment in a penitentiary, and their delivery to the superintendent, warden, or keeper of such United States prisons, shall be by the marshal of the District or Territory where such conviction may occur, after the erection and completion of said prisons. That the actual expenses of such marshal, including transportation and subsistence, hire, transportation and subsistence of guards, and the transportation and subsistence of the convict or convicts, be paid, on the approval of the Attorney General out of the judiciary fund.

confinement or that it intended to restrict the Attorney General's broad discretionary authority as to the care and custody of federal prisoners.

In light of this legislative history, it is not necessary to assume that by providing that the expenses of all transportation were to be paid by the Attorney General, the Congress intended that transportation requested by a state for purposes unrelated to the federal conviction or incarceration be paid by the federal government. Nor is it necessary to interpret the statement that prisoners "shall be transported" by agents designated by the Attorney General as precluding the Attorney General from promoting comity among sovereigns by exercising his authority to approve temporary transfers of custody. Rather, we believe it is more reasonable to conclude that Congress intended § 4008 to provide for transportation for federal purposes, such as transportation from the court of conviction to the place of confinement as did the previous statutes on which that section is based. The "clarification" mentioned in the committee reports most likely referred to the authorization for any agent designated by the Attorney General to transport prisoners rather than the marshal exclusively.

In the 1948 codification of the United States Criminal Code, the section was revised to its present form.[12] Act of June 25, 1948, Pub. L. No. 80-772, § 4008, 62 Stat. 683, 849. It was explained in a committee report that the revisions were "[m]inor changes in phraseology," not substantive changes. H.R. Rep. No. 304, 80th Cong., 1st Sess. A179 (1947). *See Muniz v. Hoffman*, 422 U.S. 454, 468-70 (1975). We conclude, therefore, that § 4008 does not prohibit the Attorney General from making arrangements for state law enforcement officers to assume temporary custody of federal prisoners for the purpose of production in a state court, pursuant to a writ of habeas corpus. Nor have we found any other federal statute which prohibits such action.

We emphasize that this memorandum addresses only those circumstances in which the Interstate Agreement on Detainers (IAD) is not applicable.[13] If the state is a party to the IAD, the procedures established under it may be exclusive. *See United States ex rel. Escola v. Groomes*, 520 F.2d 830, 837-38 (3d Cir. 1975). Even if the state involved is not a party to the IAD, that agreement should be used as a guide for all temporary transfers of custody, for state prosecution or testimony. The party states of the IAD, which now include the federal government and approximately 42 states, find that proper proceedings on charges emanating from other jurisdictions cannot be had in the absence of cooperative procedures, and declare that the purpose of the

---

[12] In 1949, the third paragraph of the section, dealing with prisoners convicted by a consular court or court martial, was amended. Act of May 24, 1949, Pub. L. No. 81-72, § 4121, 63 Stat. 89, 98. These amendments do not affect the first and second paragraphs of the section with which we are concerned here.

[13] *See* note 1, *supra.*

IAD is to provide such procedures.[14] The Department of Justice initiated and supported congressional adoption of the IAD because existing procedures were inadequate. *See* H.R. Rep. No. 1018, 91st Cong., 2d Sess. 3 (1970).

To avoid the damaging effects of detainers on prisoners, the IAD guarantees certain procedural rights to prisoners. For example, prison authorities are required to inform prisoners of all charges on the basis of which detainers have been lodged. Prisoners may then request a trial on the charges and if such trial does not commence within 180 days, the charges must be dismissed with prejudice. A non-IAD agreement to transfer custody to a state for purposes of prosecution should include all legally available safeguards of both the prisoner's and the government's interests. A state, by refusing to become party to the IAD, should not be able to avoid entirely the procedural requirements of it while securing its benefits.[15]

### III.

As you suggested in your request, additional legal questions may arise from such temporary transfers of custody. You requested that we address one such problem—escape from custody. The federal escape statute, 18 U.S.C. § 751(a) (Supp. I 1977) provides:

> Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall [be fined or imprisoned, or both].

The question raised here is whether escape from the temporary custody of the state law enforcement officers would violate this statute.

This section was first enacted in 1930, when the Bureau of Prisons was established. It read:

---

[14] IAD, Art. I, 18 U.S.C. Appendix. When the IAD was enacted by Congress, 28 states were parties to it. Congress expected that the remaining 22 states would become partners as soon as their legislatures next met. 116 Cong. Rec. 38,841 (1970) (remarks of Sen. Hruska).

[15] We do not believe that Congress intended the IAD to be the exclusive means of transfer of custody in all cases, thereby precluding transfer if the requesting state is not a party to it. Such an interpretation is not supported by the language of the Agreement or its legislative history and would exacerbate, for non-party states, the problems the Agreement is directed toward ameliorating. It would preclude any transfers to non-party states for purposes of prosecution, for example, thus leaving prisoners with no way of clearing detainers filed against them and precluding prosecutors from bringing defendants to trial within a reasonable time after charges are filed. This would result in dismissal of charges not timely prosecuted. *See Dickey* v. *Florida,* 398 U.S. 30 (1970).

728

> Any person properly committed to the custody of the Attorney General or his authorized representative or who is confined in any penal or correctional institution, pursuant to the direction of the Attorney General, who escapes or attempts to escape therefrom shall be guilty of an offense. . . .

Act of May 14, 1930, Pub. L. No. 71-218, § 9, 46 Stat. 327. In the Attorney General's analysis of this Act prior to its enactment, he explained that there was "no statutory penalty for escaping from the custody of a Federal prison or Federal officers." H.R. Rep. No. 106, *supra* at 3; S. Rep. No. 533, *supra* at 3. Since 1930, the section has been modified to clarify ambiguities and to broaden its scope. For example, in 1935, Congress added the phrase "[any person] who is in custody by virtue of any process issued under the laws of the United States by any court, judge, or commissioner." Act of Aug. 3, 1935, Pub. L. No. 74–233, 49 Stat. 513, 513-14. In 1948, several amendments were made to remove ambiguities and to improve phraseology. Act of June 25, 1948, Pub. L. No. 80–772, § 751, 62 Stat. 683, 734. *See* H.R. Rep. No. 304, 80th Cong., 1st Sess. A67 (1947).

The term "custody," as it is used in this statute, has been defined very broadly. Although none of the cases deal with the specific situation presented here, they are sufficiently analogous to support the conclusion that such escape would violate § 751. For example, in *United States* v. *Eaglin,* 571 F.2d 1069 (9th Cir. 1977), the court concluded that a prisoner serving concurrent state and federal sentences in a state penitentiary who failed to return after he was released on a "social" pass violated § 751. The court reasoned that 18 U.S.C. § 4082(b) provides that a federal sentence may be served in an institution not maintained by the federal government and that "an escape from a State institution is an escape from the custody of the Attorney General if the prisoner has been confined there under the authority of the Attorney General." *Id.* at 1073. The Ninth Circuit in an earlier case identified the three elements which must be proved to sustain a conviction under § 751: "(a) that there was a prior federal conviction; (b) that there was an escape; and (c) that such escape was from a confinement arising by virtue of the conviction." *Hardwick* v. *United States,* 296 F.2d 24, 26 (9th Cir. 1961). The court found no basis to the defendant's argument that the prisoner be in the actual physical custody of a federal official. Similarly, in *McCullough* v. *United States,* 369 F.2d 548, 550 (8th Cir. 1966), the court held that § 751 punishes "escape from custody or from any facility in which the prisoner is confined by direction of the Attorney General." If the Attorney General, through the BOP, enters into an agreement with state officials in which the state officials agree to keep the prisoner safely confined, the prisoner would be

confined by virtue of the federal conviction and by direction of the Attorney General.

In *United States* v. *Bailey,* 585 F.2d 1087 (D.C. Cir. 1978), the court upheld a conviction under § 751 of a federal prisoner who escaped from custody after being transferred to a local jail pursuant to a writ of habeas corpus *ad testificandum.* The court ruled:

> [We decide] that a prisoner who has been committed to the custody of the Attorney General by virtue of a conviction is still in the custody of the Attorney General by virtue of that conviction for the purposes of Section 751(a) when he is transferred pursuant to a writ of *habeas corpus ad testificandum* and confined in an institution designated by the Attorney General for the custody of federal prisoners. Policy considerations support at least this broad an interpretation of Section 751. The jurisdiction from which a prisoner is brought pursuant to a writ of *habeas corpus* has a significant interest in preventing the prisoner's escape from custody. This interest has been recognized in an analogous situation by the drafters of the Interstate Agreement on Detainers (IAD), who provided that when a prisoner serving a sentence in one jurisdiction is brought to another jurisdiction for trial on another offense and escapes while in the receiving jurisdiction, he may be prosecuted under the escape statute of the sending jurisdiction.

585 F.2d at 1104 (footnote omitted). We conclude, therefore, that escape from state law enforcement officers by a prisoner who is in custody pursuant to a federal conviction and is confined under the direction of the Attorney General violates § 751.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
